ARTHUR NEBEL AND WIFE, MARIE NEBEL, v. WILLIAM NEBEL, MARION NEBEL, J. A. BAKER AND WILLIAM H. ABERNATHY, DIRECTORS OF NEBEL KNITTING COMPANY, AND NEBEL KNITTING COMPANY, A CORPORATION.

(Filed 2 March, 1955.)

**1. Pleadings § 13—**

Allegations of the answer not amounting to a counterclaim are deemed denied without the necessity of a reply. G.S. 1-159.

**2. Mandamus § 1—**

*Mandamus* will lie only to compel an inferior tribunal, board, corporation, or person to perform a clear legal duty at the instance of a party having a clear legal right to demand such performance.

**3. Corporations § 16—**

Where, in an action by minority stockholders to compel the directors to declare dividends out of the accumulated profits of the corporation, the pleadings raise issues of fact, *mandamus* may not issue until the issues of fact raised by the pleadings have been finally adjudicated on their merits.

**4. Same—**

In an action by minority stockholders to compel the declaration of dividends, the setting aside of the corporate profits as working capital by resolution at a stockholders' meeting held subsequent to the institution of the action and the filing of all pleadings, should not be considered on the issue as to whether the corporate earnings had been set aside in accordance with the provisions of G.S. 55-115, but the issue with respect to compliance with the statute must be determined in accordance with the issues of fact raised by the pleadings. *Amick v. Coble,* 222 N.C. 484, cited and distinguished.

491

**5. Same—Pleadings held not to raise issue of bad faith of controlling stockholders in setting aside all profits for working capital.**

In an action by minority stockholders to compel the declaration of dividends, the complaint alleged that the controlling stockholders had pursued a policy of paying inadequate dividends in order to minimize Federal income taxes upon their own personal incomes, and that the stockholders had not set aside the accumulated profits as working capital in the manner prescribed by G.S. 55-115. The answer alleged that the bulk of the yearly profits had been used as working capital in expanding and modernizing the corporation's plant and equipment in substantial compliance with G.S. 55-115, and that plaintiff stockholders, with full knowledge, had approved and acquiesced therein. *Held:* The pleadings do not raise the issue of whether the controlling stockholders acted arbitrarily and in bad faith in setting aside all the profits as working capital. The pleadings do raise the question as to whether or not the plaintiffs are estopped from challenging the expenditure of accumulated profits for plant and equipment.

**6. Trial § 37—**

The issues in an action arise upon the pleadings filed, and the parties may not agree upon improper issues or alter the issues by the introduction of evidence or by the theory of trial.

**7. Corporations § 16—**

The setting aside of a part of the corporate profits for the expansion of plant facilities and for the purchase from time to time of new and up-to-date machinery to replace obsolete equipment, is a common practice usually essential to the normal growth and development of a corporation, and such expenditures will be presumed to have been made in good faith in the absence of fraud or proof of bad faith.

**8. Same—**

In an action by minority stockholders to compel the declaration of dividends, uncontradicted evidence tending to show that prior to the institution of the action a part of the accumulated profits of the corporation had been expended in plant expansion and equipment with the full knowledge and approval of plaintiff stockholders, entitles defendants to an instruction that if the jury believes the evidence to find in the affirmative the issue of estoppel of plaintiffs to challenge such expenditures.

**9. Same—**

The fact that substantially all of the quick assets of a corporation are invested in inventories is not a bar *per se* to the declaration of a dividend, since the corporation may nevertheless declare a dividend out of profits and borrow the money for payment, and then liquidate the loan by disposing of finished goods, collecting receivables, and reducing its inventory of raw materials.

**10. Same—**

Ordinarily, a minority stockholder is entitled to *mandamus* to compel the declaration of dividends out of accumulated profits in excess of such part of the profits as have been set aside as working capital. G.S. 55-115.

---

NEBEL *v.* NEBEL.

---

**11. Same—**

   Where a corporation has inadvertently failed to take action with respect
to setting aside capital in compliance with G.S. 55-115, *mandamus* will not
lie to compel the distribution of all the accumulated profits without regard
to the financial needs of the corporation, but in such instance, mandatory
injunction will lie to compel the stockholders to set aside a reasonable
portion of the accumulated profits as working capital, and to declare a
dividend only out of such part of the accumulated profits as can be applied
to dividends in the wise administration of a going concern.

JOHNSON, J., dissenting.

APPEAL by defendants from *McKeithen, Special Judge,* March Term,
1954, of MECKLENBURG.

Plaintiffs, who are the owners of 29.6 per cent of the outstanding stock
of the defendant corporation, instituted this action for a writ of *man-
damus* to compel the directors of the corporation to declare immediately
a dividend of the whole of the accumulated profits of the corporation, up
to and including 31st December, 1952, in the sum of $1,414,048.17.

It is alleged in plaintiffs' complaint that at the regular annual meeting
of the stockholders and directors of the defendant corporation on 28th
January, 1953, no action was taken by the stockholders with respect to
setting aside working capital for the corporation, and no working capital
for the corporation was set aside or reserved; and, at the directors' meet-
ing, which was held immediately following the meeting of the stock-
holders, the plaintiff Arthur Nebel moved that the directors declare a
dividend of the whole of the earned surplus or accumulated profits of
the corporation as of 31st December, 1952. The motion failed to get a
second and the meeting adjourned without declaring any dividend what-
soever.

The additional allegations in the complaint upon which the plaintiffs
base their right to the relief they seek, are contained in the numbered
paragraphs set out below:

"17. The defendants Marion Nebel and William Nebel, by virtue of
their ownership of a majority of the stock, are in a position to control
and do in fact completely dominate and control the stockholders meetings
of the corporation and hence the dividends policy of the corporation.

"18. The defendants William Nebel and Marion Nebel have at all
times since the incorporation of the corporate defendant under the laws
of the State of North Carolina, controlled and directed the dividends
policy of the corporation for their own personal benefit and advantage,
in order to minimize the Federal Income Taxes upon their own personal
incomes, rather than for the benefit of all of the stockholders of the
corporation.

"19. The defendants have at all times since the incorporation of the Company in North Carolina pursued a studied policy of paying grossly inadequate dividends, representing only a small fraction of the net profits after taxes earned by the corporation, and have thereby depressed the market value of the plaintiffs' stock so that there is no market for the plaintiffs' shares, thereby depriving them of the opportunity to sell their stock on the open market at any figure approaching its true book value, and have further deprived them of a fair return on their investment by denying them their fair share of the corporate income.

"20. The plaintiffs are advised and believe that they are entitled to have the provision of N. C. G. S. 55-115 complied with, and the whole of the accumulated profits of the corporation declared as a dividend, and that the defendant corporation and its majority stockholders and directors who control and dominate same have declined and refused and still decline and refuse to declare such a dividend; that the plaintiffs have no remedy other than *mandamus* to enforce their rights."

The defendants filed an answer in which they admit that the plaintiff Arthur Nebel, a stockholder and director of the defendant corporation, moved to pay out as a dividend the "entire earned surplus" as of 31st December, 1952. With respect to the dividend policy of the corporation, they allege in their further answer and defense (1) that all actions in regard to the payment of dividends have been taken "with due consideration at all times to the financial condition and the operational needs of the defendant company"; (2) "that the defendant Company does not now have any funds available for the payment of dividends and, in any sound exercise of reason and judgment, should not now undertake to pay, nor be required to pay, any dividends"; (3) "that, except for the amounts which the defendant Company has paid out in dividends, the bulk of the Company's yearly profits have been used in expanding and modernizing its plant, machinery, equipment and business in order that it could continue to operate in the fiercely competitive field of the present-day hosiery industry; that such use has been reasonable, wise and necessary; that the plaintiffs have been fully aware and continuously informed as to such use and have acquiesced therein and are now estopped to contend that such profits should have been instead paid out in dividends"; and (4) "that with respect to the requirement of Section 55-115 of the General Statutes of North Carolina, the defendants aver that in substance and to all practical intents and purposes the profits of the defendant Company, not heretofore paid out in dividends, have been from time to time reserved and set aside by the stockholders and directors of the Company as capital or working capital for the purpose and uses set forth in the preceding paragraph; . . . the defendant, William Nebel, Chairman of the Board of Directors of the defendant Company, is proceeding to call

a special meeting of the stockholders of the Company in order that they may, if they see fit, formalize, in precise compliance with the terms of the aforesaid statute, what has, as above set forth, already been done in substance and reality."

It appears from the defendants' evidence that at a special meeting of the stockholders of the defendant corporation, on 13th March, 1953, a resolution was adopted which purported to reserve and set aside as working capital all of the accumulated profits of the Company not theretofore paid out in dividends. The stock owned by the plaintiffs was voted by proxy against the resolution.

The evidence discloses that the defendant William Nebel established the Nebel Knitting Company in Charlotte, North Carolina, in 1923, which concern was incorporated in the State of New Jersey, but the defendant corporation was incorporated in North Carolina on 3rd November, 1944, and duly organized with its principal office in the City of Charlotte. The defendant corporation took over the assets of the predecessor corporation as of 1st January, 1945.

It is agreed by all parties to this action that the paid-in capital of the defendant corporation was $975,289.34 as of 1st January, 1945, for which the corporation issued 2,273 shares of no-par value stock. The plaintiffs own 673 shares of this stock, and the defendants William Nebel and his wife, Marion Nebel, own 1,148 shares. All of the remaining shares are owned by other members of William Nebel's family, except two, one of which is owned by the defendant J. A. Baker and the other by the defendant William H. Abernathy. The defendants William Nebel, father of the plaintiff Arthur Nebel, and Marion Nebel, wife of William Nebel and stepmother of Arthur Nebel, own the controlling interest in the defendant corporation.

In 1937, 1938, and 1939, Arthur Nebel was president of the New Jersey corporation and drew an annual salary of approximately $6,000.00. The defendant William Nebel requested the plaintiffs for their proxies for the January 1940 annual meeting of the stockholders of the old corporation which was to be held in New Jersey. The proxies were executed and delivered to him. At the meeting, Arthur Nebel was not re-elected president and was dropped as a director of the corporation. His stepmother succeeded him as a director and as president of the corporation and has continuously been a director and the president of the defendant corporation.

Mrs. Marion Nebel drew a salary as president of the defendant corporation of $6,000.00 annually for the years 1945 and 1946, and $7,200.00 annually beginning in 1947 through 1952, or a total of $55,200.00. William Nebel, during this same period, as Chairman of the Board of Directors, Treasurer and General Manager and Director of Sales, drew as

salary, bonuses, commissions, and royalties, a total of $361,591.55. During this same period the corporation made donations to charitable organizations in the aggregate sum of $30,161.00.

The net profits of the corporation, less depreciation of $676,000.00, and after taxes, from 1st January, 1945, to 31st December, 1952, were $1,491,330.17. The corporation paid a dividend of $3.00 per share in 1945; $10.00 in 1946; $5.00 in each of the years 1947, 1948 and 1949, and $6.00 in 1950. These dividends totaled $77,282.00, which leaves accumulated earnings with the corporation as of 31st December, 1952, of $1,414,048.17. No dividends were paid in the years 1951 and 1952, although the net earnings in those years, after depreciation and taxes, amounted to approximately $205,000.00. Also, the record discloses, the corporation paid a dividend of only $6.00 per share in 1950, which amounted to $13,638.00, while the net profits for that year, after depreciation and taxes, amounted to $297,228.93.

The total assets of the defendant corporation as of 31st December, 1952, were $2,678,973.34, of which amount $975,289.34 is the original capital investment, leaving assets in excess of the paid-in capital of $1,703,684.00, all of which, except $994,000.00, have been used in expanding and modernizing its plant, machinery and equipment. The above sum of $994,000.00 is the total amount of the corporation's quick assets against which it has liabilities of $289,635.83, leaving net quick assets on the above date of $704,364.17. These assets consisted of $96,000.00 in cash; $27,000.00 in cash surrender value of life insurance on the life of William Nebel; and the balance in accounts receivable and inventories, consisting of raw materials, stock in process, finished goods, etc.

Arthur Nebel testified that at the time he was fired as president in 1940, his father told him he would never receive any more dividends; that he has always insisted in and out of stockholders' and directors' meetings that the corporation pay reasonable dividends; that he didn't ask that his motions be recorded; that the clerk wouldn't record anything his father didn't want recorded; that he had tried to sell the stock but had been unable to do so; that he purchased the stock from his father and paid for it out of cash gifts from him together with dividends received on the stock and from salary received while he was in the employ of the company. That the amount he received from his father by way of gifts and from dividends just about equaled the amount he paid for the stock. That he has been a director of the defendant corporation since 1946; that he had acquiesced in the amounts paid, and voted for dividends paid every time except one. That he was trying to get along with his father; that on one or more occasions he proposed a certain dividend and Mrs. Marion Nebel proposed a higher one than he had proposed, and it was voted. That at the meeting of the directors in January, 1951, he made

a motion to pay a dividend of $10.00 per share but could get no second to his motion. That his father married his stepmother in 1935; that he worked at the mill until 1940 when his father told him to finish up whatever he was doing and get out. That he and his wife have been estranged from his father and stepmother since that time. "I don't think they have been in our home. We have not been in theirs. I did not have any advance notice that I was going to be fired at that annual meeting of the stockholders."

This witness further testified that as money is earned and plowed back into the Company the book value of his stock goes up; that the size of the dividends he has received has rendered his stock unsaleable. That stock in a closed, small corporation is not readily saleable anytime, anywhere. He also testified that his attorney has stipulated a value of $500,000.00 for the sale of his stock, "and that is considerably less than its book value."

The defendants offered numerous extracts from the minutes of the stockholders' and directors' meetings, showing that the plaintiff Arthur Nebel participated in these meetings when the advisability of modernizing and enlarging the plant, and the purchase of additional machinery and equipment was considered; and when it was pointed out from time to time that larger dividends should not be paid in order to take care of the increased need of the corporation for additional funds. Testimony was offered at great length as to what machinery had had to be replaced, cost of the enlargement of the plant, and the purchase of additional machinery. Since 1st January, 1945, the corporation has spent approximately $250,000.00 for additional buildings, replacing out-of-date or obsolete machinery, and for the purchase of new machinery, at an overall cost for plant, machinery and equipment of approximately $2,000,-000.00. And it does not appear from the minutes introduced in evidence that the plaintiff Arthur Nebel ever protested the expenditure of any funds in connection with the expansion or modernization of the Company's machinery and equipment.

William Nebel testified that he sold the stock to his son, which his son and wife now hold, for $125.14 per share; that its present book value is "around $1,000.00 per share." That in conversations with his son about dividends, they had discussed the needs of the Company. That in order for the business to grow and stay in good condition, the earnings must necessarily be retained in the business. "But I never did say I wouldn't pay any dividends, because only the Company could pay dividends."

The following issues were submitted to the jury: 1. Have the stockholders and directors of the defendant corporation reserved as working capital for the corporation the accumulated profits of the corporation up to December 31st, 1952? 2. If so, have the stockholders and directors

of the Company, in so doing, acted in bad faith and arbitrarily? On the first issue, the court instructed the jury, "as to that first issue, that is whether the stockholders and the directors of the defendant Company have reserved as working capital for the corporation its accumulated profits up to December 31, 1952, the court instructs you that if you believe the evidence which has been introduced in this case bearing on that issue, that is, the evidence of the plaintiff as well as the evidence of the defendant, it will be your duty to answer the first issue yes, otherwise no." The jury answered both issues "Yes." Whereupon, counsel for the plaintiffs waived in open court plaintiffs' right to demand the declaration of a cash dividend to plaintiffs in excess of $263.97 per share on the 673 shares of the capital stock of said corporation owned by them.

Judgment was entered to the effect that a writ of *mandamus* be issued against the defendant Nebel Knitting Company, and the directors thereof, commanding it and them forthwith and without unreasonable delay to declare a cash dividend to the plaintiffs on their stock, of $263.97 per share, out of the accumulated profits of said corporation. The defendants appeal, assigning error.

*Bell, Bradley, Gebhardt & DeLaney for plaintiffs.*
*Pierce & Blakeney for defendants.*

DENNY, J. The plaintiffs bottom their right to a writ of *mandamus* to compel the directors of the defendant corporation to declare immediately a dividend of the whole of the accumulated profits of the corporation, up to and including 31st December, 1952, on the ground that these accumulated profits have not been set aside and reserved as working capital in the manner prescribed by G. S. 55-115. Therefore, there is no allegation in the complaint which raises the question of bad faith or arbitrariness with respect to setting aside such accumulated profits for working capital. The gravamen of the complaint is to the effect that the defendants William Nebel and Marion Nebel have at all times since the incorporation of the corporate defendant under the laws of North Carolina, controlled and directed the policy of the corporation with respect to the payment of dividends and have pursued a policy of paying inadequate dividends in order to minimize the Federal income taxes upon their own personal incomes, and that such policy has resulted in depressing the market value of the plaintiffs' stock so that it cannot be sold in the open market at any figure approaching its true value.

On the other hand, the defendants, after denying the withholding of the payment of dividends for the reasons alleged in the complaint, aver in their further answer and defense that except for the amounts which the defendant corporation has paid out in dividends, the bulk of the

corporation's yearly profits has been used in "expanding and modernizing its plant, machinery, equipment and business," etc., and that the "plaintiffs have been fully aware and continuously informed as to such use and have acquiesced therein and are now estopped to contend that such profits should have been instead paid out in dividends." They also allege that for all practical purposes the stockholders and directors have complied with the provisions of G. S. 55-115 in that all the profits, not paid out as dividends, have been from time to time set aside as "capital or working capital" for the purposes enumerated above.

The plaintiffs filed no reply to the defendants' further answer and defense. But, since the allegations therein do not amount to a counterclaim, they are deemed denied. G. S. 1-159; *Wells v. Clayton,* 236 N.C. 102, 72 S.E. 2d 16.

Conceding that the allegations in the further answer and defense of the defendants raise an issue as to whether or not the stockholders and directors substantially complied with the provisions of G. S. 55-115 in setting aside the bulk of the profits for the purposes alleged, it likewise raises the question as to whether or not these plaintiffs are estopped by reason of their approval of and acquiescence in the action taken from time to time by the stockholders and directors with respect to the enlargement of the plant of the corporate defendant, the purchase of additional machinery needed to carry out the program of expansion, as well as the purchase of new and modern machinery to replace outmoded or obsolete equipment, from asserting any right to have the funds so expended now declared as dividends. 18 C.J.S., Corporations, section 524, page 1208, *et seq.;* Fletcher Cyc., Corporations, Per. Ed., Vol. 13, Chapter 58, section 5862, page 209, and cited cases, including *Dimpfel v. Ohio & M. Ry. Co.,* 110 U.S. 209, 28 L. Ed. 121, where it is said: "Objections now come with bad grace from parties who knew at the time all that was being done by the company, and gave no sign of dissatisfaction."

In light of the issues of fact raised by the pleadings in this action, it is proper to consider the function and purpose of a *mandamus.* It is a writ issuing from a court of competent jurisdiction, commanding an inferior tribunal, board, corporation, or person to perform a purely ministerial duty imposed by law. The party seeking such writ must have a clear legal right to demand it, and the tribunal, board, corporation, or person must be under a present clear legal duty to perform the act sought to be enforced. *St. George v. Hanson,* 239 N.C. 259, 78 S.E. 2d 885; *Hospital v. Wilmington,* 235 N.C. 597, 70 S.E. 2d 833; *Hospital v. Joint Committee,* 234 N.C. 673, 68 S.E. 2d 862; *Steele v. Cotton Mills,* 231 N.C. 636, 58 S.E. 2d 620; *Poole v. Bd. of Examiners,* 221 N.C. 199, 19 S.E. 2d 635; *Harris v. Bd. of Education,* 216 N.C. 147, 4 S.E. 2d 328; 55 C.J.S., Mandamus, section 125, page 213.

When minority stockholders seek to obtain a writ of *mandamus* to compel the directors of the corporation to pay dividends out of the accumulated profits of the corporation and the pleadings raise issues of fact, such minority stockholders are not entitled to such writ until the issues raised by the pleadings have been finally adjudicated on their merits. *Hospital v. Wilmington, supra.*

The plaintiffs state in their brief that the trial judge announced in the course of the trial that he would direct a verdict on the first issue because in his opinion the resolution passed by the stockholders on 13th March, 1953, was proper as to form and would therefore effectively bar the plaintiffs' right to recover if such action was taken in good faith. That the trial court in taking this position relied upon the opinion of this Court in *Amick v. Coble,* 222 N.C. 484, 23 S.E. 2d 854.

In *Amick v. Coble, supra,* the plaintiff in his complaint sought to have all the accumulated surplus prior to the year 1940 declared as a stock dividend and to have the profits for the years 1940 and 1941 paid out in cash dividends. When the case was called for trial, a jury trial was waived and it was agreed that the court might hear the evidence, find the facts, draw its conclusions of law and enter judgment accordingly. No working capital had ever been formally set aside by the stockholders of the corporation as contemplated by G. S. 55-115. It is disclosed by the record in the case that in the course of the hearing the court suggested it might be well for the stockholders to have a meeting and consider setting aside working capital pursuant to the provisions of the statute. A special meeting was held and the majority stockholders, over the protest of the plaintiff, purported to set aside all the accumulated profits as working capital. The court then permitted the defendants to amend their answer by alleging that the stockholders had set aside all the accumulated profits as working capital, and by alleging that it had been the policy of the stockholders and directors of the corporation, since its organization, to consider the profits of the company as working capital except the actual amount voted each year to be paid out as a dividend; and further to plead such policy as an estoppel against the plaintiff from claiming such funds were available for the payment of dividends. The plaintiff filed a reply and admitted that from the organization of the company until he was voted out of office as secretary-treasurer and general manager in early 1940, it was by mutual consent the practice to keep all the profits for the purpose of expanding the business, except those amounts actually authorized to be paid out in dividends. The plaintiff, however, alleged in his reply that the action of the stockholders in attempting to set aside all the profits for the years 1940 and 1941 as working capital, was done arbitrarily and in bad faith for the purpose of doing directly what they had already done indirectly, that is, to des-

troy the value of his stock, or to force him to sell it to the defendants at a greatly depressed figure.

The trial court, among other things, found as a fact that prior to the year 1940 the stockholders and directors, by mutual consent, each year turned all net earnings of the corporation, as the same were earned, except the amount declared as a dividend, back into the business of the corporation. The court also found in effect that the action of the defendants as majority stockholders, in setting aside all the earnings for the years 1940 and 1941 as working capital, was not done in good faith, and rendered judgment directing the payment of dividends to the extent of the profits for the years 1940 and 1941, less certain deductions. This Court directed that all the profits for those years be declared as dividends without any deductions. *Winborne, J.,* in speaking for the Court, said: "That this may be done without impairing the capital structure of the corporation is, on this record, patent."

In the instant case, the pleadings raise no issue with respect to setting aside working capital except in the manner alleged in the further answer and defense. Neither do the pleadings raise any issue as to bad faith in connection with the setting aside of working capital, but, on the contrary, as we have heretofore pointed out, the plaintiffs are asking for *mandamus* on the ground that no working capital has ever been set aside by the stockholders and directors out of the accumulated profits of the corporation.

The appellees urgently contend that the defendants insisted upon a jury trial and that it was upon their theory of the case that the issues under consideration were framed and submitted to the jury. Even so, issues arise upon the pleadings only, and not upon evidential facts. *Miller v. Miller,* 89 N.C. 209; *Fortesque v. Crawford,* 105 N.C. 29, 10 S.E. 910; *Howard v. Early,* 126 N.C. 170, 35 S.E. 258; *Wells v. Clayton, supra.*

In *Miller v. Miller, supra,* the Court said: "Parties cannot agree upon improper issues; issues arise upon the pleadings, and these alone must be tried." Likewise in the case of *Shelton v. Davis,* 69 N.C. 324, *Chief Justice Pearson* said: ". . . the idea of giving the plaintiff judgment upon a state of facts not alleged in the complaint and entirely inconsistent with it . . . is a proposition which no member of this Court can for a moment entertain." *McLaurin v. Cronly,* 90 N.C. 50; *Willis v. Branch,* 94 N.C. 142; *Whichard v. Lipe,* 221 N.C. 53, 19 S.E. 2d 14; McIntosh, Practice and Procedure, section 508, page 541.

In *Featherstone v. Glenn,* 225 N.C. 404, 35 S.E. 2d 243, during the course of the trial a stipulation was entered into and a tender made and accepted. In light of the acceptance of the tender, the issue submitted to the jury was improper and not determinative of the question left for

adjudication and this Court remanded the case for a new trial. See also *King v. Coley,* 229 N.C. 258, 49 S.E. 2d. 648; *Dobias v. White,* 240 N.C. 680, 83 S.E. 2d 785, and cited cases.

In the case of *Tucker v. Satterthwaite,* 120 N.C. 118, 27 S.E. 45, it does not appear that an exception was entered to the issues submitted; nevertheless, this Court said: "We are not inadvertent to the long line of decisions laying down the rule that the refusal of the Court to submit an issue tendered by either party can not be reviewed by this Court unless exception is taken in apt time; nor do we wish to be understood as reversing or modifying it. That rule, when reasonably construed, does not conflict with the one herein laid down. What we now say is, that sec. 395 of The Code (now G. S. 1-200) is mandatory, binding equally upon the Court and upon counsel; that it is the duty of the Judge, either of his own motion or at the suggestion of counsel, to submit such issues as are necessary to settle the material controversies arising in the pleadings, and that in the absence of such issues, or admissions of record equivalent thereto, sufficient to reasonably justify, directly or by clear implication, the judgment rendered therein, this Court will remand the case for a new trial." *Mitchell v. R. R.,* 124 N.C. 236, 32 S.E. 671, 44 L.R.A. 515; *Strauss v. Wilmington,* 129 N.C. 99, 39 S.E. 772; *Griffin v. R. R.,* 134 N.C. 101, 46 S.E. 7; *Holler v. Telegraph Co.,* 149 N.C. 336, 63 S.E. 92, 19 L.R.A. (NS) 475; *Brimmer v. Brimmer,* 174 N.C. 435, 93 S.E. 984; *Chapman-Hunt Co. v. Bd. of Education,* 198 N.C. 111, 150 S.E. 713; *Griffin v. Insurance Co.,* 225 N.C. 684, 36 S.E. 2d 225.

The plaintiffs allege in effect (1) that all of the accumulated profits of the corporation are available for the payment of dividends, and (2) that the action of the directors in paying grossly inadequate dividends from 1945 through 1950, and no dividends for the years 1951 and 1952, was due to the domination and control of William and Marion Nebel in order to minimize their Federal income taxes, which action resulted in virtually destroying the market value of the plaintiffs' stock and depriving them of a fair return on their investment. When these allegations are considered, as they must be in light of the allegations in the defendants' further answer and defense, issues are raised which should be determined in order for the matters and things involved in this controversy to be equitably adjusted.

As we interpret the record, the court's instruction on the first issue was based solely on the action of the stockholders on 13th March, 1953, and no consideration whatever was given to the defendant's further answer and defense with respect to the investment of the corporate profits or to the evidence bearing thereon. Moreover, on the second issue, which is not raised on the pleadings, the court submitted to the jury for its consideration the expenditures made by the corporation to expand its plant

and for the purchase of new machinery, etc., as bearing on the question of bad faith on the part of the stockholders in setting aside the entire surplus of the corporation as working capital on 13th March, 1953. It may well be that the defendants acted in bad faith on 13th March, 1953, *in purporting to set aside all the accumulated profits as working capital,* but this does not mean necessarily that through the years the stockholders have acted in bad faith in using corporate profits for the expansion of plant facilities and for the purchase from time to time of new and up-to-date machinery to replace obsolete equipment. In fact, such practice is so common and considered so essential to the normal growth and development of corporate enterprises, expenditures for such purposes will be presumed to have been made in good faith in the absence of fraud or proof of bad faith. We think, if it be conceded that no action was ever taken by the stockholders of the corporation with the specific intent to set aside any profits as working capital prior to the institution of this action, pursuant to the provisions of G. S. 55-115, the plaintiffs are estopped from claiming any portion of the profits of the corporation as being available for the payment of dividends, which has been invested in plant expansion, new machinery, etc., with their full knowledge and approval. And there is nothing in the record to indicate that when such expenditures were considered and discussed from time to time in the stockholders' meetings, that these plaintiffs, or either of them, interposed an objection thereto at any time. Furthermore, the plaintiff Arthur Nebel was a director of the defendant corporation during the entire period complained of, except for the year 1945, and there is no evidence that he ever opposed, protested, or voted against the expenditure of funds for plant expansion or for the purchase of new machinery. The evidence on this record will not support a finding that the expenditures for plant expansion and the purchase of new or additional machinery from time to time were made in bad faith.

Moreover, if an issue of estoppel, with respect to the investment of profits in plant expansion, machinery, etc., had been submitted in the trial below, the defendants would have been entitled on the present evidence to have the jury instructed to the effect that if it believed such evidence to answer the issue in favor of the defendants. Even if it be conceded that the plaintiffs are estopped from claiming the funds invested in plant expansion, etc., there is still an ample amount of quick assets available out of which the plaintiffs are entitled to a reasonable dividend if such dividends were withheld during the period complained of, for the reasons alleged in the complaint. And the mere fact that the officers and directors of the corporation may have substantially all the quick assets invested in inventories, consisting of raw materials, stock in process and finished but unsold goods, is not a bar *per se* to the declaration of a divi-

dend. Indeed, it is not unusual for a corporation in such a situation to declare a dividend, borrow the money with which to pay it, and then to liquidate the loan by disposing of finished goods, reducing its inventory of raw materials, and collecting receivables. 13 Am. Jur., Corporations, section 660, page 657.

It seems clear that the provisions contained in G. S. 55-115 were enacted for the purpose of protecting minority stockholders. In pertinent part this statute reads as follows: "The directors of every corporation created under this chapter shall, in January of each year, unless some specific time for that purpose is fixed in its charter, or bylaws, and in that case at the time so fixed, after reserving, over and above its capital stock paid in, as working capital for the corporation, whatever sum has been fixed by the stockholders, declare a dividend among its stockholders of the whole of its accumulated profits exceeding the amount reserved, and pay it to the stockholders on demand."

Certainly a minority stockholder, upon a proper showing, is entitled to a writ of *mandamus* to compel the majority stockholders to set aside working capital as contemplated in the above statute. Likewise, when a private corporation ascertains the amount of its accumulated profits, in excess of the part thereof which has been set aside as working capital, in the manner provided in G. S. 55-115, such profits, upon demand of the stockholders, must be paid out in dividends as required by the statute, and *mandamus* will lie to compel such distribution. *Cannon v. Mills,* 195 N.C. 119, 141 S.E. 344. Even so, where a corporation has inadvertently, or from lack of knowledge of the existence of the provisions of G. S. 55-115, failed to take action with respect to setting aside working capital, such statute may not be invoked to compel the distribution of all the accumulated profits as dividends, irrespective of the facts and circumstances under which the profits were accumulated and reinvested in plant facilities, and without regard to the financial needs of the corporation. In such a situation, a court of equity may issue a mandatory injunction to compel the stockholders to set aside a reasonable portion of the accumulated profits as working capital, to the end that the corporation may not be crippled as a going concern, and the amount of funds available for the payment of dividends may be determined. 18 C.J.S., Corporations, section 473, page 1141, and cited cases, including *Wabash R. Co. v. Barclay,* 280 U.S. 190, 74 L. Ed. 368, 67 A.L.R. 762, in which the Supreme Court of the United States said: "When a man buys stock instead of bonds he takes a greater risk in the business. No one suggests that he has a right to dividends if there are no net earnings. But the investment presupposes that the business is to go on, and therefore, even if there are net earnings, the holder of stock, preferred as well as common, is entitled to have a

dividend declared only out of such part of them as can be applied to dividends consistently with a wise administration of a going concern."

This cause should be tried *de novo* upon issues raised by the pleadings as now cast, or as they may be amended in the meantime. In the event the case is tried anew on the present pleadings, an issue should be submitted to determine whether or not dividends have been withheld improperly as alleged in the complaint. Likewise, an issue should be submitted to determine to what extent the profits of the corporation have been invested in permanent equipment with the approval or acquiescence of the stockholders, including these plaintiffs.

In the event the jury should find the defendant directors have improperly withheld the payment of dividends as alleged in the complaint, then the trial court, in the exercise of its equitable jurisdiction, should issue a mandatory injunction to the stockholders and directors of the defendant corporation, directing the stockholders to meet and to set aside in good faith such portion of the accumulated profits of the corporation as may not have been heretofore invested in plant expansion, machinery and equipment with the approval or acquiescence of the stockholders, as may be reasonably necessary for working capital, and ordering the Board of Directors of the defendant corporation to declare a dividend of all the excess of the accumulated profits up to and including 31st December, 1952, not set aside as working capital, and to report their respective actions to the court. Whether the court will find it necessary to interfere with the action of the stockholders and directors taken pursuant to the injunction, will depend upon whether or not they act in good faith. 13 Am. Jur., Corporations, section 708, page 725, *et seq.; Gaines v. Manufacturing Co.,* 234 N.C. 331, 67 S.E. 2d 355, and the cases and authorities cited therein; *Gibbons v. Mahon,* 136 U.S. 549, 34 L. Ed. 525. In the last cited case, the Court said: "Acting in good faith and for the best interests of all concerned, the corporation may distribute its earnings at once to the stockholders as income; or it may reserve part of the earnings of a prosperous year to make up for a possible lack of profits in future years; or it may retain portions of its earnings and allow them to accumulate, and then invest them in its own works and plant, so as to secure and increase the permanent value of its property."

The contention of the defendants to the effect that the defendant corporation is not in financial condition to pay any dividend at this time does not appeal to the conscience of the Court. This is particularly true, since, in addition to making a profit of $1,491,330.17, after depreciation and taxes, during the period complained of, the defendant William Nebel, who owns only 454 shares of stock in the defendant corporation, has received $361,591.55 as salary, bonuses, commissions, and royalties; and his wife Marion Nebel, who owns 694 shares of stock, has received

$55,200.00 in salary. While, in the meantime, the plaintiffs, who own 673 shares of stock in the corporation, or 29.6 per cent thereof, have received no compensation in salary or otherwise except their pro rata part of the $77,282.00 paid in dividends, which amounted to approximately $22,000.00. This is a rather insignificant return over a period of eight years on stock admitted to have a book value of about $673,000.00, and during a period in which the corporation paid in compensation to two of its principal stockholders, William and Marion Nebel, who control the corporation and own a majority of its stock, a total of $416,791.55.

The defendants' assignment of error for failure of the court below to sustain their motion for judgment as of nonsuit is overruled. A discussion of other exceptions and assignments of error, in view of the conclusion we have reached, is unnecessary.

This cause must be heard and judgment entered on the issues raised by the pleadings, in accord with this opinion. To that end the cause is remanded for a

New Trial.

JOHNSON, J., dissenting: My study of the record leaves the impression that the variance between the form of the second issue and the allegations of the defendants' further defense, on which the issue is based, is not of sufficient moment to necessitate overthrowing the verdict and trial, particularly so in view of the apparent agreement of the parties on the form of the issue and of the full and complete charge delivered by the presiding Judge thereon. Here it is to be noted that the defendants admitted failure to comply formally with the requirements of G.S. 55-115 prior to the commencement of the action. The question sought to be presented by the second issue as submitted, i.e., the bona fides of controlling management and the legal sufficiency of the means employed by such management in setting aside as capital the bulk of accumulated profits after dividends, was raised, as was the companion question of acquiescence or estoppel of the plaintiffs, not by the plaintiffs' complaint but rather by the defendants' affirmative defense. Therefore the burden of the issue was on the defendants to show good faith of controlling management. The issue as framed submitted the question of bona fides in reverse: whether the defendants acted arbitrarily and in bad faith, rather than in good faith. Moreover, the burden of the issue was placed on the plaintiffs. All this was favorable to the defendants. This being so, they are not in position to challenge the form of the issue or the verdict rendered thereon. The theory of the trial should prevail. Thrift Corp. v. Guthrie, 227 N.C. 431, 42 S.E. 2d 601.

However, it would seem that the judgment should be vacated and the cause remanded for further hearing on the question of the extent to which

---

the plaintiffs should be bound, on the ground of acquiescence or estoppel, by the action of controlling management in investing accumulated profits in equipment and permanent improvements. This question does not appear to have been properly determined before judgment. Therefore, my vote is to uphold the verdict and trial, with direction that the judgment be vacated and a further hearing ordered to determine the extent, if any, to which accumulated profits were invested in equipment and permanent improvements or otherwise capitalized with the approval and acquiescence of the plaintiffs.

The findings of the jury, or of the presiding Judge sitting as chancellor in the exercise of his equity powers, in respect to this question would determine whether controlling management has improperly withheld payment of dividends in the past; and, if so, then mandatory injunction should issue directing payment of a proper dividend, the amount thereof to be fixed and determined by the court on the basis of the facts found on the issue of acquiescence or estoppel. The jury verdict on the second issue is sufficient to justify retention of the cause on the equity side of the docket (13 Am. Jur., Corporations, section 708), and I am inclined to the view that such retention will be more conducive to an expeditious final determination of the cause.